GALEN MEDICAL ASSOCIATES, INC., Plaintiff–Appellant,

v.

UNITED STATES, Defendant–Appellee,

and

Deborah Downing MD, PLLC, Defendant–Appellee.

No. 03–5113.

United States Court of Appeals, Federal Circuit.

DECIDED: May 25, 2004.

Rehearing Denied July 20, 2004.

Terry Wallace, of Ridgeland, Mississippi, argued for plaintiff-appellant.

Brian S. Smith, Attorney, Commercial Litigation Branch, Civil Division, Department of Justice, of Washington, DC, argued for defendant-appellee, the United States. With him on the brief were Peter D. Keisler, Assistant Attorney General, David M. Cohen, Director, and Mark Melnick, Assistant Director.

J. Michael Littlejohn, Wickwire Gavin, P.C., of Vienna, VA, argued for defendant-appellee, Deborah Downing, MD, PLLC. With him on the brief was Stephanie M. Himel–Nelson.

Before MICHEL, LOURIE, and DYK, Circuit Judges.

MICHEL, Circuit Judge.

Galen Medical Associates, Inc. ("Galen") appeals from the order of the United States Court of Federal Claims granting the motions of the government and Deborah Downing M.D., PLLC ("Downing") for judgment on the administrative record. *Galen Med. Assocs. v. United States,* 56 Fed.Cl. 104 (Fed.Cl.2003). We conclude Galen has failed to establish that the award of the contract to Downing was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law, and we therefore affirm the Court of Federal Claims' judgment.

## BACKGROUND

The G.V. Sonny Montgomery Veterans Affairs Medical Center ("VA") solicited bids on May 4, 2001, for provision of medical care to veterans in Meridian, Mississippi. The solicitation stated that the VA would evaluate proposals based on technical capability, past performance, and price. The solicitation was a "best value" procurement and noted that technical capability was weighted "slightly" higher than past performance. However, of the 200 total points possible, technical capability was assigned ninety and past performance was assigned only ten. In the final evaluation of the proposals, technical capability and past performance were combined into a single "technical score" worth a maximum of 100 points. The score for bid price made up the remaining 100 points.

Three companies submitted proposals for the project: Galen, Downing (the incumbent contractor), and CR Associates. Six VA-appointed evaluators used score sheets awarding point values based on the evaluators' opinion of how well each proposal met the criteria set forth in the bid solicitation. One of the six evaluators, Frank Tuminello, was also listed in Downing's proposal as a "past-performance reference." On June 5, 2001, the VA concluded its evaluations, and Galen received an overall score of 189 (89 technical score and 100 price score). Downing scored 183 (90 technical and 93 price), and CR Associates scored 187 (95 technical and 92 price). Galen's bid price was $4,261,950, and Downing's bid price was $4,564,800.

On June 6, 2001, the VA asked the competitors to submit best and final offers ("BAFOs") by June 8, but Downing, according to the trial court, submitted some documents after the request date for the BAFOs. After the BAFOs were submitted, the VA evaluators re-scored the proposals. Downing had lowered her bid price to $4,206,900 and received a new score of 190 (90 technical and 100 price). Galen received a new score of 188 (89 technical and 99 price). In a letter dated July 27, 2001, the VA notified Galen that the contract had been awarded to Downing.

On August 3, 2001, Galen informed the VA that it wanted to engage the agency protest process and requested an opportunity for discussions with the agency pursuant to Federal Acquisition Regulations. Galen also requested documentation regarding the acquisition process. However, the VA supplied only the names of the bidders and denied Galen's request for discussions.

Galen filed a formal protest with the VA alleging bias and wrongful award of contract. The VA took no action, and Galen notified the VA that it would file a protest with the General Accounting Office ("GAO") if the VA did not address its assertions. The VA responded with three letters dated August 17 supplying additional documentation regarding the solicitation.

On August 24, 2001, Galen filed a formal protest with the GAO alleging a pattern of procurement violations. Before any action by the GAO, the VA elected to perform corrective action and decided to permit the bidders to submit new proposals for evaluation. As part of the corrective action, the VA changed the solicitation's characterization of the weight of technical capability from "slightly" more important to "significantly" more important than past performance. After the VA agreed to take corrective action, the GAO dismissed Galen's protest as moot.

Galen asked the VA whether the new solicitation would be with or without "discussions," and the VA replied that the solicitation was a "negotiated procure-

ment," that all offerors had an opportunity to re-submit proposals, and that the VA was currently in the negotiation process. Galen submitted its new bid with a reduced price of $3,648,900, but did not change its technical proposal. Downing's bid price was unchanged. CR associates first submitted a bid price of $4,583,348, but later revised its proposal and lowered its price to $4,165,572. VA's contracting officer concluded that CR Associates' revised proposal did not meet the solicitation's technical specifications, therefore, the evaluators considered only CR Associates' unrevised bid with a price of $4,583,348.

Of the members of the original panel, only Gloria Matory was an evaluator in the post-corrective action evaluation. But again, one of the evaluators for this evaluation, Ron Kirkpatrick, was listed as a past-performance reference by Downing. Kirkpatrick had been the contracting officer technical representative ("COTR") for Downing's clinic. This time, the evaluators gave Downing's bid a score of 179 (92 technical and 87 price), Galen's bid a score of 175 (75 technical and 100 price) and CR Associates' bid a score of 173 (93 technical and 80 price). The VA again awarded the contract to Downing.

Galen filed another protest with the GAO, but after concluding that Galen's proposal failed to include an adequate site for the clinic and was thus ineligible for the award, the GAO dismissed the case for lack of standing.[1] On April 30, 2002, Galen filed a complaint with the United States Court of Federal Claims pursuant to 28 U.S.C § 1491 (incorporating the standard of 5 U.S.C. § 706) alleging that the VA contract award was "arbitrary, capricious, an abuse of discretion, or otherwise not in

accordance with the law." Galen also asserted that VA officials were biased in favor of Downing during the evaluation process, a violation of 48 C.F.R. § 15.306(e)(1) which provides, "[g]overnment personnel involved in the acquisition shall not engage in conduct that favors one offeror over another." 48 C.F.R. § 15.306(e)(1) (2003).

The Court of Federal Claims determined that, rather than rejecting Galen's proposal as ineligible because of a lack of an adequate facility, the VA had evaluated it on the merits and reduced Galen's score. The court noted that Galen had a substantial chance of receiving the award and therefore had standing. The court allowed limited discovery—specifically, depositions were permitted only to determine what documents existed that must be considered part of the administrative record. After discovery, the parties cross-moved for judgment on the administrative record. Oral argument was heard on March 28, 2003. One week after oral argument, the Court of Federal Claims issued an order and opinion, noting that the VA's record-keeping may have been sloppy and that the agency could have been more forthcoming in its discussions with Galen, but nonetheless granted the defendants' motions for judgment on the administrative record because Galen had not offered sufficient evidence of bias or any other basis for finding an arbitrary and capricious award of the contract.

## DISCUSSION

A disappointed bidder may make a claim against the agency pursuant to the Administrative Procedure Act, 5 U.S.C § 702, which states:

---

**1.** Galen's primary site was occupied by Downing and Galen would not have been able to use it unless Downing gave up the lease.

Galen's secondary site was much smaller than the VA facility used at the time of the solicitation.

A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof. An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States or that the United States is an indispensable party.

5 U.S.C. § 702 (2000); *Scanwell Lab., Inc. v. Shaffer*, 424 F.2d 859, 864, 868 (D.C.Cir. 1970) (reasoning that suits challenging the award process are in the public interest and disappointed bidders are the parties with an incentive to enforce the law); *CACI, Inc.–Federal v. United States*, 719 F.2d 1567, 1574 (Fed.Cir.1983) (making the *Scanwell* doctrine applicable to the Claims Court).

In 1996, Congress amended 28 U.S.C § 1491 to add a specific provision granting both the district courts and the United States Court of Federal Claims jurisdiction to render judgment on an action brought by a disappointed bidder in a government contract procurement. Administrative Dispute Resolution Act of 1996 ("ADRA"), Pub.L. No. 104–320, § 12, 110 Stat. 3870, 3874. Thus, the Court of Federal Claims has jurisdiction "to render judgment on an *action by an interested party objecting to* a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or *the award of a contract* or any alleged violation of statute or regulation in connection with a procurement or a proposed

procurement." 28 U.S.C. § 1491(b)(1) (2000) (emphases added). We have jurisdiction to review any Court of Federal Claims final decision under 28 U.S.C. § 1295(a)(3).[2]

■ We review the grant of motions for judgment upon the administrative record in bid protest actions *de novo*, and we reapply the standard of section 706 of the Administrative Procedure Act, adopted in section 1491(b)(4) and applied by the Court of Federal Claims. *JWK Int'l Corp. v. United States*, 279 F.3d 985, 987 (Fed.Cir. 2002) (reviewing judgment on the administrative record in a bid protest without deference). Our inquiry is whether the VA's contract award was shown to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 28 U.S.C. § 1491(b)(4) (2000) (adopting the standard of 5 U.S.C. § 706(2)(A) (2000)). In bid protest cases filed under the ADRA the court implements this APA standard by applying the standard previously interpreted by the district courts in the *Scanwell* line of cases. "Under the APA standard as applied in the *Scanwell* line of cases, and now in ADRA cases, 'a bid award may be set aside if either (1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure.'" *Banknote Corp. of Am. v. United States*, 365 F.3d 1345, 1351 (Fed. Cir.2004) (quoting *Impresa Construzioni Geo. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed.Cir.2001)). Thus, "when reviewing a judgment in a bid protest case, our task is to address independently any legal issues, such as the correct interpretation of a solicitation, and then to determine whether there are any genuine issues of material fact as to whether the

---

**2.** As part of the ADRA, Congress enacted a sunset provision, terminating federal district court jurisdiction over bid protests on January 1, 2001. *Emery Worldwide Airlines, Inc. v. United States*, 264 F.3d 1071, 1079 (Fed. Cir.2001).

agency decision lacked a rational basis or involved a prejudicial violation of applicable statutes or regulations." *Id.* at 1353.

■ Because the bid protest at issue here involved a "negotiated procurement," the protestor's burden of proving that the award was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law is greater than in other types of bid protests. *LaBarge Prods., Inc. v. West,* 46 F.3d 1547, 1555 (Fed.Cir. 1995) (citing *Burroughs Corp. v. United States,* 223 Ct.Cl. 53, 617 F.2d 590, 597–98 (1980)). "The higher burden exists because the contracting officer engages in what is 'inherently a judgmental process.'" *Omega World Travel v. United States,* 54 Fed.Cl. 570, 578 (2002) (citing *Burroughs,* 617 F.2d at 598). "[T]he greater the discretion granted to a contracting officer, the more difficult it will be to prove the decision was arbitrary and capricious." *Burroughs,* 617 F.2d at 597. "In formally advertised bidding the pertinent statutes and regulations are far more strict about the conduct of the procurement than in a negotiated one, consequently in negotiated procurement the contracting officer is entrusted with a relatively high degree of discretion." *Id.*

■ Additionally, as the contract was to be awarded based on "best value," the contracting officer had even greater discretion than if the contract were to have been awarded on the basis of cost alone. *E.W. Bliss Co. v. United States,* 77 F.3d 445, 449 (Fed.Cir.1996) ("Procurement officials have substantial discretion to determine which proposal represents the best value for the government."). "'Where an evaluation is challenged, we will examine the agency's evaluation to ensure that it was reasonable and consistent with the evaluation criteria and applicable statutes and regulations, since the relative merit of competing proposals is primarily a matter

of administrative discretion.'" *Id.* (quoting *In re General Offshore Corp.,* B–251969.5, B–251969.6, 94–1 Comptroller Gen.'s Procurement Decisions (Federal Publications, Inc.) ¶ 248, at 3 (Apr. 8, 1994)).

■ "[I]t may be that even a proven violation of some procurement regulation, in selecting the competitor, will not necessarily make a good claim. Not every regulation is established for the benefit of bidders as a class, and still fewer may create enforceable rights for the awardee's competitors." *Id.* (quoting *Keco Indus., Inc. v. United States,* 203 Ct.Cl. 566, 492 F.2d 1200, 1206 (1974)). "[T]o prevail in a protest the protester must show not only a significant error in the procurement process, but also that the error prejudiced it." *Data Gen. Corp. v. Johnson,* 78 F.3d 1556, 1562 (Fed.Cir.1996).

■ Moreover, when a bidder alleges bad faith, "[i]n order to overcome the presumption of good faith [on behalf of the government], the proof must be almost irrefragable." *Info. Tech. Applications Corp. v. United States,* 316 F.3d 1312, 1323 n. 2 (Fed.Cir.2003). "Almost irrefragable proof" amounts to "clear and convincing evidence." *Am–Pro Protective Agency, Inc. v. United States,* 281 F.3d 1234, 1239–40 (Fed.Cir.2002). "In the cases where the court has considered allegations of bad faith, the necessary 'irrefragable proof' has been equated with evidence of some specific intent to injure the plaintiff." *Torncello v. United States,* 231 Ct.Cl. 20, 681 F.2d 756, 770 (1982).

### I.

### A.

■ As a threshold matter, where, as here, a challenge to a contract award is based on alleged violations of "regulation

or procedure," a claimant must show " 'a clear and prejudicial violation of applicable statutes or regulations.' " *Banknote,* 365 F.3d at 1351 (quoting *Impresa,* 238 F.3d at 1333). To establish prejudice, the claimant must show that there was a "substantial chance it would have received the contract award but for that error." *Statistica, Inc. v. Christopher,* 102 F.3d 1577, 1582 (Fed. Cir.1996). Downing argues Galen has not suffered any prejudice because the facilities listed in its proposal did not meet the technical specifications of the VA solicitation, and therefore, Galen could not have been awarded the contract. The Court of Federal Claims found that the VA did not reject Galen's proposal because of non-complying facilities, but rather, only reduced its technical score. *Galen Med.,* 56 Fed.Cl. at 106–07. The court also found that Galen finished second after both evaluations, and therefore, but for the alleged errors, had a substantial chance of receiving the award. *Id.* at 107. We agree, and proceed to the merits.

### B.

Galen asserts the Court of Federal Claims erred by applying an improper standard of proof to its post-award bid protest action. Specifically, Galen argues the court required Galen to establish bias "beyond a shadow of a doubt."

■■■ We reject this argument. The court stated the standard of proof as follows:

We note first that our standard of review in *post-award bid protest* cases is narrow. We may only set aside the contract if the VA's actions were arbitrary and capricious, or otherwise not in accordance with the law. Additionally, we assume that the government acts in good faith while contracting and a protester needs "well-nigh irrefragable proof" that the government had an in-

tent to injure it to overcome this presumption. The burden is therefore on the plaintiff to show that, but for the alleged error in the procurement, it likely would have been awarded the contract. A protestor's burden is higher for a negotiated procurement because the contracting officer has broad discretion when engaging in an inherently judgmental process.

*Id.* at 108 (citations omitted) (emphasis added). Galen, however, points to the court's statement during oral argument on motions for judgment on the administrative record before the Court of Federal Claims:

It would not be possible for me to write a decision with a straight face, saying I am so well satisfied that there was bias here, or an abuse of the system to try to benefit Downing that it's clear beyond a shadow of a doubt and this whole procurement has to be undone.

Tr. 85. We rely on the court's written opinion rather than its oral statement during a hearing on a motion for judgment on the administrative record. We conclude the court clearly stated the proper standard of proof, and we see no evidence that it applied a different standard than articulated in its opinion.

### C.

■■■ At oral argument, Galen asserted that it requested depositions of *all* the VA evaluators, but that this request was denied by the Court of Federal Claims. However, after review of the Court of Federal Claims status conference transcripts, we conclude that Galen did not request depositions of all four post-corrective action evaluators, did not object when the Court of Federal Claims tentatively limited the depositions' scope to whether certain documents existed that should be part of the administrative record, and did not

properly preserve any issue of insufficient discovery for appeal. Galen's failure to pursue broader discovery and to object to its denial constitutes waiver of the issue and we will not consider it here.

### D.

■ Galen also argues the court erred in not considering all the facts in their totality, but instead viewed each fact "in isolation from the others." We disagree. The court stated:

> Plaintiff's complaints regarding the initial solicitation, however, were rendered moot when the VA vacated the award and agreed to amend the solicitation. On the other hand, plaintiff's allegations of a pattern of bias are based on these same events as well as events relating to the amended solicitation. We will assume, without deciding, that a long pattern of questionable activity might be relevant to prove agency bias. In considering plaintiff's claims, therefore, we take into account *all* circumstances surrounding the procurement.

*Galen Med.*, 56 Fed.Cl. at 109 (emphasis added). The court then went on to address serially the multiple events of each solicitation that Galen asserted as evidence of the VA's alleged bias in favor of Downing. The court concluded its discussion of the events surrounding the pre-corrective action evaluations, saying, "[i]n short, none of these assertions individually or *collectively* demonstrate bias." *Id.* at 110 (emphasis added). That the court also considered Galen's numerous allegations one by one does not demonstrate that, despite its statement quoted above to the contrary, it actually viewed each fact only in isolation. We discern no error in the court's method of analysis.

### II.

### A.

Additionally, Galen asserts that the court erred by ignoring or improperly discounting clear violations of the statutes and regulations governing the procurement at issue. Before the Court of Federal Claims, Galen asserted that the VA failed to conduct meaningful discussions with offerors after the post-corrective action solicitation as was supposedly required under 48 C.F.R. § 15.306(d)(3). However, the Court of Federal Claims held that the VA was permitted to forego discussions by section 15.306(a)(3), which states, "[a]ward may be made without discussions if the solicitation states that the Government intends to evaluate proposals and make award without discussions." 48 C.F.R. § 15.306(a)(3) (2003). The court found that the VA solicitation stated that the contract would be awarded "without discussions." It is Galen's burden to show that the court's finding was clearly erroneous, and we can discern no clear error.

### B.

■ On appeal, Galen also argues that the VA waived the "without discussions" provision and then violated 48 C.F.R. § 15.306(d)(3) by communicating with Downing but not with Galen. But no evidence established any such communication with Downing. The trial court did not clearly err in failing to find such communication proven. Moreover, in the context of a government contract proposal, the term "discussions" has a specific legal definition: "discussions involve negotiations" and "are undertaken with the intent of allowing the offeror to revise its proposal." *Info. Tech.*, 316 F.3d at 1321 (quoting 48 C.F.R. § 15.306(d) (2002)). In contrast to discussions, "clarifications" are "limited exchanges, between the Government and of-

ferors, that may occur when award without discussions is contemplated." 48 C.F.R. § 15.306(a)(1) (2003). The regulation further states:

> [i]f award will be made without conducting discussions, offerors may be given the *opportunity to clarify* certain aspects of proposals (e.g., the relevance of an offeror's past performance information and adverse past performance information to which the offeror has not previously had an opportunity to respond) or to resolve minor or clerical errors.

48 C.F.R. § 15.306(a)(2) (2003) (emphasis added). Thus, even if the VA received clarifying information from an offeror such as Downing during the bidding process, such communication was not a prohibited "discussion."

Galen points mainly to certain changes made to Downing's pre-corrective action bid price by the contracting officer, Newton, as evidence she was in improper communication ("discussions") with Downing. Moreover, Galen argues that erasures made by evaluators Harbor and Matory during the pre-corrective action evaluation indicate that some of those evaluators must have improperly received new information from Downing.[3]

We doubt that the VA's behavior before corrective action could constitute a waiver of a post-corrective action solicitation provision. We need not make that determination here, because, as discussed below, Galen has failed to show the VA engaged in improper, indeed any, discussions with Downing. The Court of Federal Claims concluded that Galen's complaints regarding the initial solicitation were rendered moot when the VA vacated the award and agreed to amend the solicitation. We agree that the complaints based on pre-corrective action events are moot where

charged as a specific violation of a code or statute, but are relevant in order to establish a possible pattern of bias.

Regarding Newton's change to Downing's bid price during the pre-corrective action solicitation, the Court of Federal Claims found that Newton's change was in the nature of a correction of an obvious mathematical error, and, moreover, actually increased Downing's bid price. That finding of fact is correct. Certainly, Galen has failed to show clear error in it. Galen does not contest the nature of the error in the bid, it only asserts Newton must have been told to correct it by Downing. However, even if an exchange of information leading to a correction of this type occurred, it would fall squarely within the definition of "clarification" rather than "discussion." In light of the legal definition of "discussions" and the court's finding of fact concerning the nature of the error in Downing's bid, we conclude that Galen has failed to show clear error in the court's conclusion that Newton's change to Downing's bid price was not the result of an improper "discussion" between Newton and Downing.

As to the evaluators' changed score sheets, the Court of Federal Claims stated:

> The evaluator score sheets were works in progress. The lack of explicit evaluator documentation of changes by itself does not support a finding of bias. Moreover, without strong evidence to the contrary, unexplained changes to the score sheets are assumed to be properly within the scope of the evaluation.

*Galen Med.*, 56 Fed.Cl. at 109. As Galen has presented no evidence to the contrary, we conclude the court's finding that the score sheets were works in progress was not clearly erroneous. Evaluators need

---

3. In addition, it should be noted that no numerical changes were made afterward.

not document every clerical step taken during filling out score sheets as part of the bid evaluation process. Additionally, the record shows many of Galen's scores were explained on the face of the score sheets. Galen, however, argues the absence of complete documentation of all changes demonstrates that improper discussions must have occurred. However, Galen's burden was to produce evidence of improper discussions, not simply advance a theory as to why changes were made to score sheets during an ongoing scoring process. In fact, Galen produced no evidence, and instead asked the Court of Federal Claims to draw inference upon inference in its favor. The court declined, and we think properly so. Whether examined separately or as a whole, Galen's purely speculative assertions fail to support a conclusion that improper discussions occurred between the VA and any offeror. Accordingly, we conclude that the VA did not conduct improper discussions with Downing, and has not violated section 15.306(d)(3).

## C.

In addition, Galen states that it adduced evidence of several examples of the VA's failure to properly document the proposal and award process and that the grant of judgment on so incomplete an administrative record was per se legal error. Specifically, Galen alleges that gaps in the administrative record prevented the court from conducting a meaningful review of the award process, and, therefore, that the contract award should be set aside. As evidence of improper gaps in documentation, Galen again points to several undocumented changes in evaluators' scores. As explained above, Galen has failed to show clear error in the Court of Federal Claims' finding that the score sheets were works in progress. As such, they need not have been documented at every turn. Also, the

many comments that did appear on the score sheets themselves added information to the record and would have assisted the court to conduct a meaningful review.

Galen also argues that no documentation was produced explaining the need for a second, different evaluation panel. The Court of Federal Claims made no findings of fact on this issue. However, it is apparent from the record that the evaluation panel was changed only after Galen's formal protest to the GAO spurred the VA voluntarily to undertake corrective action and request submittal of new proposals. Galen was so informed. Galen has offered no reason why further explanation is necessary, and we find none.

Galen also asserts that a gap in documentation arises because the instructions provided to each evaluation panel were not in written form. There again, the court made no finding of fact on this issue, but we discern from the deposition testimony of Newton, the VA's contracting officer, that no written instructions are legally required and as a general practice, they are not provided. Rather, only oral instructions are given. Therefore, an absence of written instructions for the evaluators is not evidence of failure to make or keep required records, or otherwise improper. We have considered Galen's many other assertions concerning inadequate documentation and consider them also to lack merit. The court entered final judgment in favor of the defendants, and by implication, found that the administrative record was not so incomplete as to preclude meaningful review. We agree.

## D.

 Galen alleges VA officials failed to provide a statement advising offerors of a post-award debriefing in the pre-corrective action solicitation and failed to provide in-

formation about what documents were subject to disclosure, violations of 41 U.S.C. § 253b(e)(1) and (4). Galen also alleges the VA refused to engage in open and frank discussions as required by 48 C.F.R. § 33.101. We agree with the Court of Federal Claims that such alleged violations were rendered moot by the order of a new solicitation by the VA.

Galen also alleges the VA violated 48 C.F.R. § 15.303 by not establishing a source selection strategy. It is unclear from Galen's brief whether it is referring to the pre-correction solicitation or the post-correction solicitation. The Court of Federal Claims made no findings of fact on this issue, indeed, it is not apparent whether it was raised before this appeal. In any event, the evidence presented by Galen is entirely unpersuasive. Galen points only to Newton's deposition testimony where she states she in fact drafted a source selection strategy as reflected in the score sheets.

### III.

Galen asserts that the VA's evaluation process manifested a conflict of interest, or that the VA acted in bad faith.

### A.

■ Galen points to an alleged conflict of interest on the evaluation panel. Specifically, Galen asserts that because Downing listed one of the post-corrective action technical evaluators as a "past performance reference," the evaluation panel was tainted with a conflict of interest. The amended solicitation requested three references to "validate past experience and any current contracts providing services of this type." In her proposal Downing listed as past performance references: Tuminello, Dayton, and Kirkpatrick. Tuminello served as an evaluator on the first round evaluation panel, and Kirkpatrick served

on the post-corrective action panel. The pre-corrective action panel was comprised of six members, and the post-corrective action panel had only four members.

■ In order to prevail on its conflict of interest claim, Galen must establish a violation of statutory or regulatory conflict of interest provisions. *See* 18 U.S.C. § 208 (2000); 5 C.F.R. § 2635.403(c) (2003); 48 C.F.R. §§ 1–18 (2003). The mere presence of one of Downing's past performance references on each evaluation panel alone does not constitute proof of a conflict of interest. The Court of Federal Claims commented on Downing's list of past performance references:

> Plaintiff highlights Dr. Downing's incumbent status and her close ties with the VA as evidence of bias. For example, two of Dr. Downing's references participated as evaluators during the solicitation process. Accepting plaintiff's argument, however, would improperly penalize Dr. Downing simply for the experience and familiarity with the agency she acquired as the incumbent contractor. *The mere fact that Dr. Downing's references were included on the panel as evaluators does not support a presumption of bias.*

*Galen Med.,* 56 Fed.Cl. at 111 (emphasis added) (citing *Omega World Travel,* 54 Fed. Cl. at 575). We agree. Indeed, to the extent there is a presumption, it is that government officials act in *good faith. Am–Pro Protective Agency,* 281 F.3d at 1239.

This court's case law does not define "conflict of interest" so broadly as to include the mere listing of an evaluator as a past performance reference to "validate past experience." No case so holding has been cited by Galen. Indeed, our precedent points to the contrary. For example, in *CACI, Inc.–Federal,* we discussed

whether a conflict of interest existed when four of the five members of the proposal evaluation board were alleged to have prior professional and social relationships with the vice president of the successful bidder. 719 F.2d at 1567. This court reversed the trial court's decision that the award of the contract was arbitrary, capricious and an abuse of discretion, rejecting the argument that discussions of employment between two evaluators and the successful bidder supported reversal of the contract award, and noting that the discussions were "only preliminary exploratory talks, directed to possibilities that never materialized, not negotiations," and occurred long before the Department issued the request for proposals. *Id.* at 1578. We also rejected the argument that an increase in scores for the successful bidder in the second round of bidding showed favoritism toward that company, where the scores for the losing company were also increased and the losing company received the highest score on its technical proposal. *Id.* at 1580.

In contrast to the facts in *CACI,* the VA's evaluation panel in the present case had only one evaluator out of four with alleged ties to Downing. During the pre-corrective action evaluation, one of Downing's three past-performance references was on a panel of six technical evaluators. During the post-corrective action evaluation, one past-performance reference was on a panel of four technical evaluators. Moreover, there is no evidence that either Tuminello or Kirkpatrick had been contacted and agreed to serve as a past-performance reference for Downing, and thus no evidence that they were interested in her success as opposed to simply more knowledgeable about her. Indeed, VA officials with direct knowledge of an incumbent service provider's past performance would seem to have enhanced utility as evaluators. It was Kirkpatrick's prior

work experience at the VA that gave him insight into Downing's performance. The incumbent service provider then included Kirkpatrick as a past-performance reference. This fact alone does not disqualify Kirkpatrick as a technical evaluator in a bid solicitation involving that service provider, and neither reason nor precedent so requires. Here, Galen has not shown any active close or pecuniary relationship between Downing and either evaluator at any time. Therefore, the mere fact that Downing listed an evaluator as a past performance reference does not constitute a conflict of interest.

It is also significant that no code section forbids an agency official listed as one to validate past performance reference from serving as an evaluator. This gap is especially noteworthy in light of the specificity with which the regulations restrict certain activities such as: employment negotiations (48 C.F.R. § 3.104–3), receipt of gifts or favors (48 C.F.R. § 3.101–2), and disclosure of proposal information (48 C.F.R. § 603.104–4).

And even to the extent the regulations require that any conflict of interest or even the appearance of a conflict of interest in government-contractor relationships be avoided, 48 C.F.R. § 3.101–1 (2003), Galen has failed to show any potential symbiotic relationship between the technical evaluators and Downing. Indeed, Galen has not shown that Kirkpatrick or any other evaluator had any "interest" or any appearance of an "interest" in an award of the contract to Downing. Galen has presented no evidence of any impact an award of the contract to either Downing or Galen would have on any of the evaluators. For even an appearance of a conflict of interest to exist, a government official must at least appear to have some stake in the outcome of government action influenced by that individual. Galen has shown no

such connection here. As required by the solicitation, Downing listed past performance references to validate Downing's "past experience and any current contracts providing services of this type." The mere presence of an individual's name on list of past performance references does not indicate any "interest" on the part of that individual in the final outcome of the evaluation.

### B.

■■■ Galen further alleges that the evaluations were biased in favor of Downing. In order to prevail on an allegation of bad faith, Galen must show "almost irrefragable" proof. *Info. Tech. & Applications*, 316 F.3d at 1323 n. 2. As evidence of bad faith, Galen argues that an examination of the technical scores given by Kirkpatrick and Tuminello is instructive. During the first round, Tuminello scored both Galen and Downing a ten on past performance and CR Associates a five. Galen's lowest score from any evaluator for past performance was a ten, Downing's was an eight, and CR Associates' was a five. In the overall technical score, Tuminello gave Galen a 91, Downing a 95 and CR Associates a 94. Galen's highest technical score received from any evaluator was a 99, and its lowest was an 82. Downing's highest technical score was a 98 and her lowest was a 75.

During the post-corrective action evaluation, Kirkpatrick gave Galen a six of a possible ten for past performance, Galen's lowest score from any evaluator. However, Kirkpatrick also gave Downing a nine in past performance while another evaluator gave Downing a ten. Additionally, Kirkpatrick gave Downing a technical score of 89; this score tied for lowest among Downing's evaluators, and another evaluator gave Downing a technical score of 99. These numbers hardly constitute

"almost irrefragable proof" as is needed to establish bias on the part of either of Downing's references. The technical scores Tuminello and Kirkpatrick gave Downing were never the highest given by any member of the panel, and instead were roughly in line with the average of what other panel members gave. Similarly, Galen consistently received low technical scores from the majority of evaluators. Indeed, in the post-corrective action evaluation, every evaluator scored Galen last in overall technical score.

The technical scores given by Kirkpatrick do not even demonstrate unconscious bias on his part. Kirkpatrick gave Downing an 89 and CR Associates an 88. Johnson gave Downing a 90 and CR Associates a 91. Stokes gave Downing a 99 and CR Associates a 100. Finally, Matory gave Downing an 89 and CR Associates a 93. It is clear that all the post-corrective action evaluators, even ones with absolutely no connection to Downing, scored Downing and CR Associates approximately equally. This fact is especially striking when one considers the large variation in overall technical scores from evaluator to evaluator—Stokes gave both bidders a score of approximately 100, whereas Kirkpatrick gave them both a score of approximately 89. Despite a swing in overall score of eleven points, Downing and CR Associates always received nearly identical scores.

The court found the evaluators' decisions to give Galen such low technical scores were, rather than the result of bias against Galen, based on weaknesses in Galen's proposal. The Court of Federal Claims stated:

> Moreover, the record supports the evaluators' concerns that plaintiff lacked proper references, a viable clinic location, adequate capacity for the veteran population, and documentation of adequate support staff. While these con-

cerns may not have been treated as rendering plaintiff's offer nonresponsive, they were plainly serious concerns for the evaluators. Plaintiff has not offered any evidence that these concerns were contrived.

*Galen Med.*, 56 Fed.Cl. at 111. The court found that the facility Galen listed as its primary clinic site was leased to Downing at the time of bid proposal. We discern no clear error in this finding. As all four post-corrective action evaluator score sheets indicate that the evaluators were concerned that Galen would not be able to provide an acceptable clinic location, the evaluators' decisions to give Galen relatively low technical scores appear to be the result of analysis of objective evidence. Additionally, Galen admits in its brief that, in order to operate the clinic with qualified staff, it would have had to hire two of Downing's nurses, another fact noted on evaluators' score sheets. In light of the above, we agree with the Court of Federal Claims that the evaluators' decisions to give Galen lower scores than any other bidder were not arbitrary, capricious, an abuse of discretion or otherwise not in accordance with the law.

Accordingly, the evaluators' scoring history does not demonstrate even unconscious bias on Kirkpatrick's part, particularly under the clear and convincing standard of proof applicable here. Galen has not demonstrated that any of the evaluators favored Downing during the technical scoring process and certainly has not provided clear and convincing evidence of a specific intent to injure Galen.

### C.

Galen asserts that numerous other events support its theory of a pattern of bias. First, Galen claims that the VA "awarded Downing the right to continue a 1995 VA contract that had been awarded to another party without using a competitive procurement process to transfer it to Downing," and that after this contract expired, the VA permitted Downing to continue to operate under the contract. The trial court made no findings of fact on this issue, but even if Downing received the contract as Galen says, Galen does not explain why such action by the VA would be improper, or how it proves a biased procurement for the contract award at issue here.

 Galen also argues that, during the pre-corrective action procurement, the VA was biased in favor of Downing in that it permitted her to submit material after the June 8, 2001 request date for BAFOs. Whether and what were unclear in terms of any late submission. But in any event, the Court of Federal Claims found that the request date was not a "hard and fast cut-off." *Id.* at 109. As evidence that June 8 was a true deadline, Galen points to a VA document distributed at a May 18, 2001, pre-proposal conference which stated that proposals were due May 31 and that, "[n]o late offers would be considered." This evidence not only is unpersuasive, but irrelevant. The VA's statement was clearly in the context of the initial submission of proposals on May 31, not the later BAFO request date. Galen points to no evidence that the June 8 date was more than a mere request date. Therefore, we can discern no clear error in the court's finding that the BAFO request date was not a "hard and fast cut-off." Accordingly, assuming receipt by the VA of certain unidentified material from Downing after the BAFO request date does not support Galen's theory of a pattern of bias.

Galen argues that the VA virtually ignored Downing's allegedly poor past performance. The court found that the only support for the allegation that Downing had a poor past performance record was

Galen's counsel's statements in briefing and oral argument. Statements of counsel, however, are not evidence. Thus, there was absolutely no proof of poor performance, as the trial court correctly found. Galen has not shown the court clearly erred.

On appeal, however, Galen points to a memo addressed to Kirkpatrick, dated June 27, 2001, from an employee of Downing who had been fired on the same day. Though not clear from Galen's brief, we understand Galen's specific argument to be that the Court of Federal Claims clearly erred in not commenting on the memo and/or not relying on it as proof of Downing's alleged poor performance. However, although the court did not specifically mention the memo in its opinion, the memo was in the administrative record before it. To the extent the memo casts doubt on Downing's past performance, we note the credibility concerns associated with a statement made by an employee on the very day that employee was fired. In light of the above, Galen has failed to show the court clearly erred in not characterizing the memo as proof of Downing's allegedly negative past performance. Moreover, given that the technical evaluation was an inherently judgmental process requiring deference, it would be improper for us to determine what effect, if any, a memo of the kind cited by Galen would have on any bidder's score.

In a related allegation, Galen asserts that the VA improperly discounted Galen's past performance in that it did not accept all three of Galen's past performance references. The court found that the record supported the evaluators' concerns that one of Galens's past performance references was not relevant to Galen's track record of professional performance or professional capability to operate a clinic. Galen has not offered evidence to the contrary, and we conclude the court's finding of fact was not clearly erroneous. Therefore, we agree with the court's conclusion that the VA uniformly evaluated the bidders on their past performance through the requirement of three past performance references.

Galen further asserts that the VA's corrective action was done in order to minimize the impact of Downing's alleged poor past performance. However, the court found that the corrective action did not change the substance of the scoring process—the allocation of points between technical capability and past performance remained exactly the same. Galen has not submitted evidence to the contrary, and, thus, failed to show clear error in the court's finding.

Galen asserts that the VA conducted improper discussions with Downing resulting in Newton's change of Downing's bid price and technical evaluators' changed score sheets. These allegations were addressed above and need not be rediscussed here other than to say we agree with the court's conclusion that these alleged discussions, even assuming they in fact occurred, do not support Galen's theory.

Galen argues that the VA accepted Downing's incorrect claim for preferential status as a "Disabled Veteran Owned Small Business Concern." However, the court found that there was no evidence that the VA gave any preference to Dr. Downing based on that alleged status. It noted that the proposal did not even offer such preference. On appeal, Galen has failed to adduce any evidence contradicting the court's finding. Therefore, we conclude the court's finding was not clearly erroneous.

On appeal, Galen argues that the VA should have penalized Downing for alleged dishonesty involving her statement concerning disabled veteran ownership of her

clinic. However, the court made no finding as to whether Downing's claim was dishonest rather than merely mistaken. Nor does Galen adduce any evidence that Downing's misstatement was intentional. Moreover, Downing's husband was a veteran. Therefore, we conclude that the VA did not demonstrate bias by not penalizing Downing.

In summary, Galen's many assertions do not alone or in combination constitute clear and convincing proof that the VA was biased in favor of Downing. In conclusion, we agree with the Court of Federal Claims that Galen has failed to show by "almost irrefragable" proof a pattern of bias, and we therefore affirm.

### IV.

Finally, Galen argues that it is entitled to its post corrective action bid preparation costs because it has demonstrated that the VA's award of the contract to Downing was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law. We conclude, however, that the Court of Federal Claims' grant of judgment on the administrative record in favor of the defendants as to the post-corrective action award was proper, and the award was not shown by Galen to be arbitrary, capricious, an abuse of discretion or otherwise not in accordance with the law. Therefore, Galen is not entitled to recover its bid preparation costs on this basis.

### CONCLUSION

Accordingly, in all respects, we affirm the Court of Federal Claims' grant of judgment on the administrative record in favor of Downing and the government.

*AFFIRMED.*

### COSTS

No costs.