BAYFIRST SOLUTIONS, LLC, Plaintiff,

v.

The UNITED STATES, Defendant.

No. 12–131 C.

United States Court of Federal Claims.

April 30, 2012.[1]

1. This opinion was issued under seal on April 5, 2012. Pursuant to ¶ 6 of the ordering language, the parties were invited to identify source selection, proprietary or confidential material subject to deletion on the basis that the material was protected/privileged. Brackets ( [ ] ) identify the redacted portions of this opinion.

Lawrence Block, Washington, DC, for plaintiff. Jennifer Zucker and Brian Walsh, of counsel.

Delisa M. Sanchez, United States Department of Justice, with whom were Stuart F. Delery, Acting Assistant Attorney General, Jeanne E. Davidson, Director, Franklin E. White, Jr., Assistant Director, Washington, DC, for defendant. Luisa M. Alvarez, United States Department of State, Rosslyn, VA, of counsel.

## OPINION AND ORDER

BUSH, Judge.

BayFirst Solutions, LLC (BayFirst) filed its pre-award bid protest complaint on February 27, 2012. In its amended complaint, BayFirst challenges the actions of the United States Department of State (State Department or Agency) taken "in furtherance of issuing a task order to Alutiiq International Solutions, LLC (Alutiiq) under Alutiiq's existing [Indefinite Delivery/Indefinite Quantity (ID/IQ)] contract with the Agency." Compl. ¶ 1 (punctuation altered). The contemplated acquisition is for diplomatic security protection management services. *Id.* ¶ 2. BayFirst requests that the court

> [e]njoin the State Department from proceeding with the proposed award of a task order under Alutiiq's existing ID/IQ contract, or any other contract vehicle and enjoin any future transition activities in

furtherance thereto [and] [d]eclare that the proposed award of a task order under Alutiiq's existing ID/IQ contract and transition activities were improper and violative of federal laws and regulations.

*Id.* at 8.

The administrative record (AR) of this procurement was filed on March 9, 2012, corrected to replace illegible pages on March 20, 2012, and supplemented with five additional pages per the court's oral ruling on March 29, 2012. Briefing was filed according to an expedited schedule and oral argument was held on March 29, 2012. As discussed below, the court cannot sustain plaintiff's protest. Defendant's motions to dismiss and for judgment on the administrative record are therefore granted, and plaintiff's motion for judgment on the administrative record is denied.

## BACKGROUND

Contract work similar to the contract work at issue in this protest was awarded to Harding Security Associates, Inc. (Harding) in 2006, pursuant to a five-year contract (one base year and four option years). That contract was set aside for 8(a) small business concerns. In 2009, however, Harding was purchased by a large business and lost its 8(a) small business status. AR at 1. At that point, the Agency sought a waiver from the Small Business Administration so that Harding could continue as the incumbent contractor on the contract, even though it had lost its 8(a) certification, but the waiver was denied. *Id.* n. 1.

The Agency then issued a solicitation in 2010 (Solicitation) which sought to replace Harding with a small business contractor. BayFirst submitted a proposal in response to the Solicitation, and included Harding as its subcontractor for that bid. The Agency awarded to another offeror, and BayFirst protested that award at the Government Accountability Office (GAO). After losing at GAO, BayFirst filed a complaint in this court on August 15, 2011. Meanwhile, the Agency kept issuing short extensions of a bridge contract awarded to Harding. *See* AR at 149, 254, 256, 272, 280, 290.

Shortly after the complaint was filed in this court, the Agency considered ending its contractual relationship with Harding and obtaining the same services under a task order with Alutiiq. This court eventually issued an injunction of the contract award to BayFirst's competitor in December 2011. *BayFirst Solutions, LLC v. United States,* 102 Fed.Cl. 677 (2012) (*BayFirst I*). The *BayFirst I* opinion highlighted several drafting errors, inconsistencies and ambiguities in the Solicitation, *BayFirst I,* 102 Fed.Cl. at 681–82 & n. 2, 687–90, 694–95, but enjoined the contract award because "the Agency made significant errors in applying the evaluation criteria set forth in the solicitation, and produced documents supporting its award decision that were teeming with factual errors," *id.* at 697. The court noted in its decision that one option available to the Agency was the cancellation of the Solicitation and re-procurement of the work requirement. *Id.* at 696–97. The Agency cancelled the Solicitation on February 3, 2012, and noted its intent to issue a new procurement under the 8(a) set-aside program. AR at 288.

The current contract with Harding is set to expire on May 20, 2012. AR at 3. The Agency took various steps to begin the transition from Harding to Alutiiq, including introducing the current Harding employees to Alutiiq representatives at a meeting held on February 24, 2012. Pl.'s Mot. at 18. In response to the transition activities, BayFirst filed its protest in this court on February 27, 2012. The parties agreed that certain transition activities would halt while the court considered BayFirst's protest.

The Agency's transition of the contract services to Alutiiq, although not yet finalized, envisions issuing a task order to Alutiiq to provide continuity of services from May 21, 2012 until a new solicitation issues and a follow-on contract can be awarded, with award of the follow-on contract tentatively scheduled to occur before the end of August 2012. The task order would include a base period of slightly over three months, May 21, 2012 to August 31, 2012, and an option period of six months, September 1, 2012 to February 28, 2013. AR at 8. The total value of the task order is projected to be $[ ]. *Id.* The court agreed to render a decision on this

protest on or before April 6, 2012 so that a smooth transition to Alutiiq would still be possible in the event that the protest is denied.

BayFirst, a bidder that responded to the Solicitation and which now states that it intends to bid on the follow-on contract, alleges that the proposed issuance of a task order to Alutiiq would deprive BayFirst of one of its "greatest assets." Compl. ¶ 23. According to BayFirst, a task order awarded to Alutiiq would "prevent[ ] the BayFirst team from bidding on the new [follow-on contract] solicitation because [BayFirst] will no longer be able to offer the [Harding] incumbent employees." *Id.* In other words, BayFirst argues that it would lose the competitive advantage of being able to offer the Harding incumbent employees for the follow-on contract, because these employees would either become Alutiiq employees or would leave their contract positions at the State Department.

## DISCUSSION

### I. Bid Protest Jurisdiction

■■■ This court "shall have jurisdiction to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1) (2006). The jurisdictional grant is "without regard to whether suit is instituted before or after the contract is awarded." *Id.* As a threshold jurisdictional matter, however, the plaintiff in a bid protest must show that it has standing to bring the suit. *Info. Tech. & Applications Corp. v. United States,* 316 F.3d 1312, 1319 (Fed.Cir.2003) (*ITAC*); *Myers Investigative & Sec. Servs., Inc. v. United States,* 275 F.3d 1366, 1369 (Fed.Cir.2002) (citation omitted).

### II. Standard of Review for Judgment on the Administrative Record

■■■ Rule 52.1(c) of the Rules of the United States Court of Federal Claims (RCFC) provides for judgment on the admin-

istrative record. To review a motion, or cross-motions, under RCFC 52.1(c), the court asks whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record. *Bannum, Inc. v. United States,* 404 F.3d 1346, 1356–57 (Fed.Cir.2005). The court must make factual findings where necessary. *Id.* The resolution of RCFC 52.1(c) cross-motions is akin to an expedited trial on the paper record. *Id.*

### III. Bid Protest Review

■■■ The court first examines whether the plaintiff in a bid protest has standing to bring the suit. *ITAC,* 316 F.3d at 1319. Standing arises from prejudice, which is present if the plaintiff establishes that it is an interested party with a direct economic interest in the procurement. *Id.* (citing *Am. Fed'n of Gov't Employees v. United States,* 258 F.3d 1294, 1302 (Fed.Cir.2001) (*AFGE* )). Bid protest standing is limited to those plaintiffs who are " 'actual or prospective bidders or offerors whose direct economic interest would be affected by the award of the contract or by the failure to award the contract.' " *Weeks Marine, Inc. v. United States,* 575 F.3d 1352, 1359 (Fed.Cir.2009) (quoting *AFGE,* 258 F.3d at 1302). In the context of a pre-award bid protest, a plaintiff must establish that it has suffered or will suffer a " 'non-trivial competitive injury which can be addressed by judicial relief.' " *Id.* at 1362.

■■■ As the United States Court of Appeals for the Federal Circuit has stated, "the proper standard to be applied in bid protest cases is provided by 5 U.S.C. § 706(2)(A) [ (2006) ]: a reviewing court shall set aside the agency action if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.' " *Banknote Corp. of Am. v. United States,* 365 F.3d 1345, 1350–51 (Fed.Cir.2004) (citing *Advanced Data Concepts, Inc. v. United States,* 216 F.3d 1054, 1057–58 (Fed.Cir.2000)). Under this standard, a procurement decision may be set aside if it lacked a rational basis or if the agency's decision-making involved a clear and prejudicial violation of statute, regulation or procedure. *Emery Worldwide Airlines,*

*Inc. v. United States,* 264 F.3d 1071, 1085–86 (Fed.Cir.2001) (citing *Impresa Construzioni Geom. Domenico Garufi v. United States,* 238 F.3d 1324, 1332–33 (Fed.Cir.2001)). *De minimis* errors in the procurement process, however, do not justify relief. *Grumman Data Sys. Corp. v. Dalton,* 88 F.3d 990, 1000 (Fed.Cir.1996) (citing *Andersen Consulting v. United States,* 959 F.2d 929, 932–33, 935 (Fed.Cir.1992)). The bid protest plaintiff bears the burden of proving that a significant error marred the procurement in question. *Id.* (citing *CACI Field Servs., Inc. v. United States,* 854 F.2d 464, 466 (Fed.Cir.1988)).

■■■■■ "The arbitrary and capricious standard applicable [in bid protests] is highly deferential [and] requires a reviewing court to sustain an agency action evincing rational reasoning and consideration of relevant factors." *Advanced Data Concepts,* 216 F.3d at 1058 (citation omitted). When challenging a regulatory violation, the bid protest plaintiff must show that there was a significant, prejudicial violation of a procurement regulation providing enforceable rights to bidders. *Galen Med. Assocs. v. United States,* 369 F.3d 1324, 1330 (Fed.Cir.2004) (citations omitted). As to protests involving allegations of bad faith conduct by the government, the following standard applies:

> [W]hen a bidder alleges bad faith, [i]n order to overcome the presumption of good faith [on behalf of the government], the proof must be almost irrefragable. Almost irrefragable proof amounts to clear and convincing evidence. In the cases where the court has considered allegations of bad faith, the necessary irrefragable proof has been equated with evidence of some specific intent to injure the plaintiff.

*Id.* (citations and quotations omitted).

■■■■■ Examples of arbitrary and capricious agency action include when "the agency 'entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or [the decision] is so implausible that it could not be ascribed to

a difference in view or the product of agency expertise.'" *Ala. Aircraft Indus., Inc.-Birmingham v. United States,* 586 F.3d 1372, 1375 (Fed.Cir.2009) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983)) (alteration in original). The court will, however, "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Bowman Transp., Inc. v. Arkansas–Best Freight Sys., Inc.,* 419 U.S. 281, 286, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974) (citation omitted). " 'If the court finds a reasonable basis for the agency's action, the court should stay its hand even though it might, as an original proposition, have reached a different conclusion as to the proper administration and application of the procurement regulations.' " *Honeywell, Inc. v. United States,* 870 F.2d 644, 648 (Fed.Cir.1989) (quoting *M. Steinthal & Co. v. Seamans,* 455 F.2d 1289, 1301 (D.C.Cir.1971)).

■■■■ If, on the other hand, the government procurement action fails review under the standards cited above, the court "proceeds to determine, as a factual matter, if the bid protester was prejudiced by that conduct." *Bannum,* 404 F.3d at 1351. Plaintiff again bears the burden of proof. *Id.* at 1358. "Prejudice is a question of fact." *Id.* at 1353 (citing *Advanced Data Concepts,* 216 F.3d at 1057).

## IV. Protest Grounds Summary and Relevant Legal Issues

Plaintiff's protest grounds may be discerned both from the amended complaint and subsequent filings.[2] These include allegations that (1) the Solicitation was improperly cancelled; (2) the decision to issue a task order to Alutiiq violates 13 C.F.R. § 124.506 (West, Westlaw through March 29, 2012);[3] (3) the proposed Alutiiq task order violates the scope of Alutiiq's ID/IQ contract with the State Department; and, (4) the Agency's transition activities, which contemplate moving the contract services from Harding to

2. The court did not require a second amended complaint, given the constraints of the accelerated briefing schedule of this bid protest.

3. This regulation was significantly amended on March 14, 2011. *See* Small Business Size Regulations, 76 Fed.Reg. 8222, 8260 (Feb. 11, 2011).

Alutiiq, violate regulations in the Federal Acquisition Regulation (FAR) embracing the concepts of fairness, impartiality and equal treatment of offerors. In addition, although BayFirst has repeatedly disavowed that it has alleged bad faith on the part of the Agency, the complaint and other filings by plaintiff contain a strong undertone of allegations of improper motive on the part of the Agency and of specific intent to injure Bay-First.

These protest grounds raise several issues. The first issue is whether, as defendant contends, BayFirst lacks standing to bring this bid protest. The second issue is whether, as persuasively argued by defendant, 41 U.S.C.A. § 4106(f) (West, Westlaw through P.L. 112–81) acts to bar some of the challenges brought by plaintiff in this bid protest. Third, with respect to any of BayFirst's protest grounds which survive defendant's jurisdictional challenges, the court must decide whether the record supports plaintiff's allegations of impropriety. The court begins with the issue of standing, which is a threshold jurisdictional matter.[4] *ITAC,* 316 F.3d at 1319.

## V. BayFirst's Standing to Bring this Bid Protest

■■■■ Both parties agree that the proper standard used to determine standing is provided by *Weeks Marine.* BayFirst must show that it was an actual or prospective bidder and that it has suffered or will suffer a " 'non-trivial competitive injury which can be addressed by judicial relief.' " *Weeks Marine,* 575 F.3d at 1363. Properly framed in the context of this procurement, BayFirst was an actual bidder on the Solicitation and is a prospective bidder on an amended Solicitation and on a follow-on contract, depending on the nature and timing of such a procurement.[5] BayFirst's competi-

tive injury, alleged in the amended complaint and in subsequent filings, is that its competitive advantages would be greater if the Agency had not canceled the Solicitation and initiated transition of the contract services from Harding to Alutiiq. Whether these advantages flow from BayFirst's status as the lowest-price offeror responding to the Solicitation, its status as the offeror that teamed with the incumbent contractor, or its status as a qualified bidder in a competitive procurement (as opposed to its status as an ineligible competitor for a task order), it is clear that the cancellation of the Solicitation and the Agency's acquisition plan have caused or will cause BayFirst a non-trivial competitive injury. Under *Weeks Marine,* BayFirst has established that it was an actual or prospective bidder and that it has suffered or will suffer a non-trivial competitive injury. The remaining question is whether BayFirst's injury may be redressed by judicial relief.

■■■■ Standing, this court has typically held, is predicated on an initial review of the complaint and the allegations therein. *Linc Gov't Servs., LLC v. United States,* 96 Fed. Cl. 672, 695 (2010). BayFirst has standing because BayFirst seeks to invalidate the cancellation of the Solicitation and the proposed issuance of a task order to Alutiiq. If all of plaintiff's protest grounds succeeded, it is clear that the court could fashion a remedy that would redress at least some portion of BayFirst's competitive injury. Here, if the court issued an injunction of the cancellation of the Solicitation and of the proposed issuance of a task order to Alutiiq, BayFirst is a potential competitor for whatever competition the Agency might choose to pursue to fulfill its needs at the State Department's Office of Overseas Protective Operations. BayFirst thus has standing to bring this suit. *See, e.g., Magnum Opus Techs., Inc. v. Unit-*

---

4. The court is not aware of precedential guidance as to whether standing should be considered before or after the task order protest ban embodied in § 4106(f). Both are jurisdictional issues and must be decided before the merits of this case can be considered. Because the discussion of § 4106(f) naturally flows into a discussion of the merits of one of plaintiff's claims, the court begins its jurisdictional inquiry with the issue of BayFirst's standing to bring this suit. A similar

approach was taken by this court in *Omega World Travel, Inc. v. United States,* 82 Fed.Cl. 452 (2008).

5. Plaintiff has indicated that BayFirst's 8(a) status will change on June 13, 2012, which might affect BayFirst's eligibility to bid on the follow-on contract. Pl.'s Reply at 24.

502

*ed States*, 94 Fed.Cl. 512, 531 (2010) (holding that if the protestor, upon success on the merits of its suit, could benefit from a competition of a contract requirement, the protestor has standing).

The court notes, however, that plaintiff's requested relief is not perfectly crafted to fit within the authority of this court. The relief requested in the complaint largely focuses on obtaining an injunction of the task order award to Alutiiq, or a declaratory judgment that the Agency's transition activities and proposed issuance of a task order to Alutiiq are invalid, both of which are proper requests for relief. Compl. at 8. In plaintiff's motion, on the other hand, BayFirst requests two alternative forms of relief. First, plaintiff asks the court to "direct[ ] the State Department to issue and award a new solicitation by May 20, 2012." Pl.'s Mot. at 22. In the alternative, plaintiff asks that the court "direct[ ] the State Department to re-solicit the original solicitation for further bids." *Id.*

As defendant notes, plaintiff does not provide legal authority to support its requests that the court direct the Agency "to issue and award a new solicitation by May 20, 2012[or] to re-solicit the original solicitation for further bids." Pl.'s Mot. at 22. The court agrees with defendant that neither of these remedies requested by plaintiff in its motion for judgment on the administrative record appears to be within the power of the court. This court has the power to strike down the cancellation of the Solicitation and to return the procurement to its prior status, and the power to enjoin the issuance of a task order to Alutiiq, but the Agency retains the discretionary power to take any legal action thereafter. *Parcel 49C Ltd. P'ship v. United States*, 31 F.3d 1147, 1154 (Fed.Cir. 1994). Despite the overly ambitious nature of the some of the relief requested by Bay-First, the court nonetheless concludes that its injunctive and declaratory relief powers could produce a tailored remedy that would, at least in part, redress the competitive inju-

ry suffered by BayFirst. For this reason, BayFirst has standing to bring this suit.

## VI. Jurisdiction Withdrawn by the Ban on Task Order Protests

 Pursuant to § 4106(f) as recently amended and in relevant part:

> A protest is not authorized in connection with the issuance or proposed issuance of a task or delivery order except for ... a protest on the ground that the order increases the scope, period, or maximum value of the contract under which the order is issued.

41 U.S.C.A. § 4106(f). This court has consistently interpreted the ban as prohibiting task order protests in this court on any grounds other than the specific excepted allegations of excessive scope, period or value of the proposed task order.[6] *See, e.g., Global Computer Enters., Inc. v. United States*, 88 Fed. Cl. 350, 416 (2009); *A & D Fire Prot., Inc. v. United States*, 72 Fed.Cl. 126, 134 (2006). The more interesting legal question is the extent of the ban—in other words, how wide is the net cast by the words "in connection with" in § 4106(f)? When a protestor alleges multiple grounds for relief, and among the protest grounds is a task order protest, which other grounds are "in connection with" the proposed issuance of the task order?

There seems to be some variation in this court's approach to interpreting the term "in connection with" when applying the ban on task order protests in particular cases. In one case, the court considered certain milestones in the agency's decisionmaking process to be "connected" with a decision to issue a task order:

> An agency's procurement process involves several phases, including the (1) identification of a procurement need, (2) decision to acquire the need, and (3) development of an acquisition plan through which to acquire goods or services that will satisfy the need. The process is sequential, with the agency's fundamental, underlying decision to proceed forward with an acquisition having a direct connection to the occurrences

6. The ban has two versions, § 4106(f) for civilian contracts and 10 U.S.C.A. § 2304c(e) (West 2010 & Supp.2011) for military contracts.

that follow. In the absence of this decision to acquire a specific need, a procurement simply cannot take place. All subsequent procurement actions flow directly from the agency's decision to procure goods or services in the first instance.

*DataMill, Inc. v. United States,* 91 Fed.Cl. 740, 756 (2010). The court therefore concluded that the decision to proceed with a sole-source procurement was "in connection with" the agency's proposed issuance of a task order to achieve that aim, and rejected the plaintiff's attempts to distinguish the initial decision to sole-source a requirement from the decision to issue a task order. *Id.* at 762. The court held that it was without jurisdiction over the protest because of the task order protest ban. *Id.*

In another case, this court divided the preliminary stages of a procurement into a 'needs identification' stage as well as a 'contract vehicle selection' stage, and determined, albeit arguably in *dicta,* that the earlier stage of decision-making in a procurement is not "in connection with" the proposed or actual issuance of a task order.[7] *See MORI Assocs., Inc. v. United States,* 102 Fed.Cl. 503, 534 (2011) ("Since at this stage an agency could just as well choose not to go down the task order road as to follow it, this choice is not "in connection with the issuance or proposed issuance of a task or delivery order" any more than it is in connection with ... any other option at the agency's disposal."). In yet another case, the court considered whether the procurement decision challenged in that bid protest was directly related or peripheral to the issuance of task orders, and decided that because the challenged action went "to the heart of the [government's] decision to award the task orders as it did," the protestor's challenge was barred by the task order protest ban. *Mission Essential Pers., LLC v. United States,* 104 Fed.Cl. 170, 179 (2012).

■■■ It appears that these variations in interpretation of the task order protest ban, none of which is binding on this court, arise in the complex and distinct fact patterns of individual bid protests. It may be that each

protest requires a fact-intensive inquiry as to the agency's decision-making process, and a careful analysis of the connectedness of each challenged procurement decision to the issuance or proposed issuance of a task order. The court adopts that approach in this case. The court notes that when a procurement decision is *connected* to the proposed issuance or issuance of a task order, and the protest ground challenging that action does not fall within the enumerated exceptions presented in 41 U.S.C.A. § 4106(f), the court has no jurisdiction over that particular challenge. *See, e.g., Omega World Travel, Inc. v. United States,* 82 Fed.Cl. 452, 464 (2008) (rejecting, on jurisdictional grounds, any challenges to the issuance of a task order other than an "excessive scope" challenge).

### A. Plaintiff's ᐟ Challenges that Are Clearly Connected to the Proposed Issuance of a Task Order

#### 1. The Scope Challenge

■■■ Plaintiff alleges that the proposed task order to Alutiiq exceeds the scope of Alutiiq's ID/IQ contract. Pl.'s Mot. at 8–15; Pl.'s Reply at 25–27. This challenge falls within this court's jurisdiction under the task order protest ban exception provided in § 4106(f)(1)(A). The standard to be applied to such a challenge is provided by *AT & T Communications, Inc. v. Wiltel, Inc.,* 1 F.3d 1201 (Fed.Cir.1993) (*AT & T*). According to the *AT & T* precedent, the court examines whether the task order materially departs from the scope of the underlying ID/IQ contract, and whether bidders for the ID/IQ contract would have reasonably anticipated that the proposed task order services would be included in the scope of the ID/IQ contract. *See id.* at 1205, 1207; *RhinoCorps Ltd. v. United States,* 87 Fed.Cl. 481, 489 (2009) ("If any change made to a procurement is within the scope of work originally contemplated, no [further] competition is required, and jurisdiction is not present."); *Phoenix Air Grp., Inc. v. United States,* 46 Fed.Cl. 90, 105 (2000) (following *AT & T* when considering an excessive scope chal-

---

7. The court in *MORI Associates, Inc. v. United States,* 102 Fed.Cl. 503, 541–42 (2011) held that

the task order protest ban had expired and was no longer in effect at the time of that protest.

lenge permitted by the exception to the task order protest ban).

■■■ BayFirst has offered a detailed analysis of the Alutiiq ID/IQ contract, but has not shown that the proposed task order materially departs from the scope of the ID/IQ contract. Further, despite plaintiff's arguments to the contrary, bidders for that ID/IQ contract would have reasonably anticipated that the services currently provided by Harding could be ordered through the ID/IQ contract awarded to Alutiiq. A comparison of Alutiiq's ID/IQ contract and Harding's bridge contract reveals that the proposed task order does not exceed the scope of Alutiiq's ID/IQ contract.

The purpose of Alutiiq's ID/IQ contract is sufficiently broad:

> The purpose of this solicitation is to provide the Department of State with contractor personnel necessary to effectively support the Bureau of Diplomatic Security Antiterrorism Assistance Programs and other offices [here and abroad] as required. The contractor shall provide program management personnel as required to support current Department tasking and to support other offices via task orders.

AR at 18. The Harding contract is for a similar purpose:

> The purpose of this contract is to provide the Department of State (DOS) with contractor personnel necessary to support the Bureau of Diplomatic Security's (DS) Office of Overseas Protective Operations. The Contractor shall provide personnel to assist DS in the management and administration of personal protective services, financial management, acquisition support, information management, and administrative programs.

AR at 164. Both contracts require that the contractor provide contractor employees who have knowledge of overseas security issues affecting State Department personnel. *Compare* AR at 19 with *id.* at 164. Both contracts require that the contractor provide administrative personnel who have financial management skills. *Compare* AR at 19 *with id.* at 165. The court concludes that the proposed task order does not materially depart from the scope of the Alutiiq ID/IQ contract, under the binding precedent of *AT & T*.

Plaintiff argues that there is a material difference between the position classifications listed in the Alutiiq ID/IQ contract and those listed in the Harding contract, and between the focus of the ID/IQ contract (anti-terrorism training) and the focus of the task order (overseas personnel protective services contracting). Pl.'s Mot. at 9–15; Pl.'s Reply at 25–27; Oral Argument Transcript (Tr.) at 53–55. For these reasons, plaintiff asserts that a bidder on the ID/IQ contract would not have anticipated the issuance of a task order to support the Office of Overseas Protective Operations. The court disagrees.

The employee positions identified in Alutiiq's ID/IQ contract are reasonably analogous to the positions identified in the proposed task order. *See* AR at 365. The ID/IQ contract contains language indicating that the awardee might be tasked to provide additional types of contract employees to other offices within the Bureau of Diplomatic Security, and that other project assignments, with other purposes, would be within the scope of this contract. *See, e.g.,* AR at 7–8, 26. The court concludes that a bidder for Alutiiq's ID/IQ contract would have reasonably anticipated that a task order for twenty employees to support a different office within the Bureau of Diplomatic Security, the proposed task order challenged here, would be within the scope of that ID/IQ contract. In the court's view, the type of work and positions to be filled by Alutiiq under the task order are well within the broad scope of its ID/IQ contract. *See AT & T,* 1 F.3d at 1205 (noting that "a broad original competition may validate a broader range of later [orders for contract work] without further bid procedures"). For these reasons, plaintiff's scope challenge to the proposed issuance of a task order to Alutiiq fails.

**2. The Removal from 8(a) Competition Challenge**

■■■ Plaintiff's argument that 13 C.F.R. § 124.506 has been violated is another protest ground that is "in connection with" the proposed issuance of a task order to Alutiiq.

*See* Pl.'s Mot. at 6–7 ("The proposed . . . task order award to Alutiiq under its existing ID/IQ contract for any period of time for the requirements previously accepted into the 8(a) . . . program as a competitive procurement under the [now cancelled] Solicitation violates 13 C.F.R. § 124.506(b)."). Pursuant to 41 U.S.C.A. § 4106(f), however, this challenge to the proposed issuance of a task order is barred, because there is no exception to the previously discussed ban that would allow this challenge. The court therefore lacks jurisdiction to consider this protest ground brought by BayFirst.

■■■■ Even if the court could consider this protest ground, plaintiff's argument is fundamentally flawed. The proposed task order, including the six month option period, is valued at $[ ]. Thus, this task order's dollar amount falls *below* the competitive acquisition threshold identified in § 124.506(a)(2)(ii), which is currently established at $4,000,000. *See* Small Business Size Regulations, 76 Fed. Reg. 8222, 8260 (Feb. 11, 2011) (announcing that the competitive acquisition threshold identified in § 124.506(a)(2)(ii) would be raised from $3,500,000 to $4,000,000 on March 14, 2011). The regulation that plaintiff alleges has been violated here, § 124.506(b), only applies to acquisitions valued *above* the competitive acquisition threshold identified in § 124.506(a)(2)(ii). Because the regulation cited by plaintiff does not apply to the task order proposed by the State Department, its restrictions on government contracting are irrelevant. Thus, even if the court had jurisdiction over this challenge, plaintiff has not identified a clear violation of a procurement regulation. For all of these reasons, the court rejects plaintiff's challenge

to the removal of the contract work from the 8(a) program.[8]

### 3. Plaintiff's Allegations of Unfairness and Disparate Treatment

■■■ Plaintiff relies on a variety of general pronouncements in the FAR, which largely concern the fair and impartial treatment of offerors, to challenge the proposed issuance of a task order to Alutiiq.[9] These regulations include 48 C.F.R. §§ 1.102(b)(3); 1.102–2(c)(3); 1.602–2(b); 3.101–1 (2011). The court notes that because these allegations focus on actions that are in connection with the Agency's proposed issuance of a task order to Alutiiq, these protest challenges are barred by § 4106(f), which contains no exception for this type of challenge. For that reason, the court cannot consider this challenge to the State Department's anticipated transition from Harding to Alutiiq.

■■■ Even if the court could consider this protest ground, the court does not consider that the cited pronouncements in the FAR provide enforceable rights to bidders in all procurement scenarios. *See, e.g., Galen,* 369 F.3d at 1330 (noting that the 'violation of procurement regulations' prong of this court's review of bid protests only applies to regulations providing bidders with enforceable rights); *Cal. Indus. Facilities Res., Inc. v. United States,* 100 Fed.Cl. 404, 412 (2011) (noting that in some circumstances, "the application of FAR 1.102–2(c) to sustain a bid protest may be debatable") (citations omitted). Plaintiff has not cited any binding precedent which supports the use of these admonishments in the FAR to show a clear and prejudicial violation of procurement regulations.[10] Instead, plaintiff relies on a num-

---

8. Even if the task order's value had been above the competitive acquisition threshold, the court agrees with defendant that plaintiff has failed to allege a clear violation of § 126.504(b). The Agency never proposed issuing a sole source 8(a) contract to Alutiiq—it proposed issuing a task order. Plaintiff has cited no authority for its argument that the proposed issuance of a *task order* violates § 126.504(b), which addresses sole source acquisitions.

9. Plaintiff also cites these same regulations to support its allegation that the Solicitation was improperly canceled. That protest ground will be separately considered below.

10. Neither of the Federal Circuit cases cited by plaintiff can be read to hold that these regulations create enforceable rights for bidders. *See R & W Flammann GmbH v. United States,* 339 F.3d 1320, 1324 (Fed.Cir.2003) (characterizing 48 C.F.R. § 1.602–2 as an example of a "procurement officer's general regulatory duty to ensure fair treatment" but not addressing the question of whether a bid protestor obtains enforceable rights through this regulation); *NKF Eng'g, Inc. v. United States,* 805 F.2d 372, 377 (Fed.Cir. 1986) (discussing 48 C.F.R. § 1.602–2 only in the context of the authority that regulation provides a contracting officer to police the bidding pro-

ber of decisions issued by this court which have held that general fairness statements in the FAR may support a protest alleging a violation of procurement regulations. *See, e.g., MORI*, 102 Fed.Cl. at 524–25 (holding that FAR 1.602–2 creates an enforceable right for bidders under the 'violation of procurement regulations' prong of this court's bid protest jurisdiction). The court notes that the law in this area, *i.e.*, the court's review of the government's duty to conduct procurements in a fair manner, is unsettled since the Federal Circuit discussed this court's bid protest jurisdiction in *Resource Conservation Group, LLC v. United States*, 597 F.3d 1238 (Fed.Cir.2010) (*Resource Conservation*). The court also notes that other decisions of the Court of Federal Claims are not binding in this case.

The court acknowledges that there may be instances where the general pronouncements in the FAR admonishing contracting officers to act with fairness and integrity provide a gauge with which to measure equitable treatment of offerors. In cases, for example, where similarly situated offerors have received disparate treatment, the regulatory framework cited by plaintiff might be of some utility. *See BayFirst I*, 102 Fed.Cl. at 691 (citing FAR 1.102–2(c) as support for its finding that an agency acted in an arbitrary and capricious fashion when it rated the past performance of two offerors according to different standards). Here, however, plaintiff seeks to apply an abstract and generalized standard of fairness to the treatment of a bidder on a canceled solicitation, as contrasted with the treatment of a proposed task order contractor. BayFirst and Alutiiq are not similarly situated, so a disparate treatment inquiry fails to measure the fairness of the Agency's transition plan. *See L–3 Commc'ns EOTech, Inc. v. United States*, 87 Fed.Cl. 656, 670 (2009) (citing FAR 1.102–2(c)(3) in support of the proposition that two contractors may be treated differently by a procuring agency when these business entities are not similarly situated). To test whether the Agency's treatment of BayFirst in its transition plan satisfies the general fairness pronouncements in the FAR does

not appear to this court to be a useful inquiry, or an inquiry that is well-founded in the precedent binding on this court. *See Castle–Rose, Inc. v. United States*, 99 Fed.Cl. 517, 532 (2011) (interpreting *Resource Conservation* and holding that FAR 1.102 and 1.102–2 have "no binding legal force").

Nonetheless, if jurisdiction for this challenge existed, and the court were to apply the fairness standards in the FAR cited by plaintiff, the court finds nothing unfair in the Agency's proposed transition of contract services from Harding to Alutiiq. Plaintiff suggests that "[t]he Agency seeks to foreclose the possibility that BayFirst will be able to compete on a level playing field by transitioning the BayFirst team employees to Alutiiq prior to the issuance and award of the new contract." Pl.'s Mot. at 7. Yet, incumbent contractors such as Harding have no permanent right to their incumbency, especially, as in this case, if they are no longer eligible for the small business set-aside program that provided the legal basis for their contractual relationship with the government. BayFirst seeks, it appears, to benefit from the continuation of Harding's incumbency after May 20, 2012, a date after which Harding has no legitimate right to provide the contested contract services to the State Department. BayFirst has not established that the Agency's treatment of the BayFirst team (BayFirst and Harding) has violated the principles of fairness set forth in the FAR.

■■■■ If this court had jurisdiction over plaintiff's fairness challenge to the transition plan of the Agency, which it does not, the only logical standard of review, well-established in precedent binding on this court, is whether the State Department has acted in bad faith. Plaintiff has repeatedly (but indirectly) insinuated that bad faith has infected the State Department's transition plan, *see, e.g.*, Pl.'s Reply at 24 (implying that the Agency was "orchestrating a procurement in a targeted effort to exclude a potentially successful protestor from competing"), but has also repeatedly refused to formally allege bad faith, *id.* at 22 ("BayFirst did not claim bad faith, only disparate treatment. . . ."). As this court recently noted, bid protest

cess and to preserve the integrity of the procure-

ment system).

plaintiffs attempting to avoid the evidentiary burden required to show bad faith should not be permitted to disguise such allegations so as to avoid the relevant burden of proof. *CRAssociates, Inc. v. United States,* 102 Fed. Cl. 698, 715 (2011) (stating that "this court will not allow through the back door a claim that [is] barred at the front by plaintiff's inability to overcome evidentiary hurdles"). To the extent that plaintiff's challenge to the State Department's transition plan presents indirect and muted allegations of bad faith, the court finds no evidence of bad faith in the record before it.

For all of these reasons, plaintiff's challenge to the fairness of the State Department's transition plan fails.

## B. The Agency's Decision to Cancel the Solicitation Is Not Connected with the Proposed Issuance of a Task Order

■ Although this is a close question, the court views the State Department's decision to cancel the Solicitation as a decision not "in connection with" the proposed issuance of a task order. Therefore, plaintiff's improper cancellation challenge is not barred by 41 U.S.C.A. § 4106(f). Notwithstanding this determination, it is noted that the record before the court could be read either way, and the law is not entirely clear on the application of the task order protest ban. Therefore, it is appropriate for the court to set forth a brief discussion of its legal analysis of this issue.

The court considers first the reasons why BayFirst's improper cancellation claim could be barred by § 4106(f). The Agency began considering the proposed issuance of a task order to Alutiiq before it canceled the Solicitation, and continued to consider this option as its best option after the Solicitation was cancelled. Thus, temporally, the two events are certainly "connected." It also appears that the decision to cancel the Solicitation was to a great extent facilitated by the Agency's tentative plans to transition the Harding contract services to Alutiiq by means of a task order. In other words, because the cancellation of the Solicitation would make little sense if no viable short-term contracting vehicle was at hand, the cancellation of the Solicitation and the proposed transition of contract services to Alutiiq appear to be intertwined. Thus, the record supports, to a large extent, a connection between the cancellation of the Solicitation and the proposed issuance of a task order to Alutiiq.

Further, it is by no means clear that the task order protest ban was meant by Congress to encourage this court to separately analyze multiple grounds in a protest that presents a direct challenge to the proposed issuance of a task order. The text of the statute merely states, in relevant part, that "[a] protest is not authorized in connection with the issuance or proposed issuance of a task or delivery order." 41 U.S.C.A. § 4106(f)(1). If a procurement process is viewed as a continuum of acts and decisions by the procuring agency which culminates in the proposed issuance of a task order, the statutory ban casts a wide net and bars challenges to the cancellation of a previously-issued solicitation, because that decision clears the way for the issuance of a task order. Thus, given the record before the court and the lack of precedential guidance as to the interpretation of § 4106(f), the court could reject plaintiff's improper cancellation claim for lack of jurisdiction, because the cancellation of the Solicitation could be viewed as a decision made in connection with the proposed issuance of a task order.

The court believes, however, that the record and analogous bid protest decisions support a different conclusion. The cancellation of the Solicitation may be viewed as a discrete procurement decision and one which could have been the subject of a separate protest. This approach is not unlike the one employed by the court in *MORI,* where a preliminary procurement decision, one which should have occurred before any contract vehicle was selected, was held to be subject to challenge and not barred by § 4106(f), even though the agency eventually issued a task order to fulfill its needs. 102 Fed.Cl. at 533–34. As further authority, there is at least one GAO decision where a protestor challenged both the cancellation of a solicitation and the subsequent issuance of a task order which provided continuity of service until a new solicitation could issue. *e-Man-*

*agement Consultants, Inc.; Centech Grp., Inc.,* B–400585.2, B–400585.3, 2009 CPD ¶ 39, 2009 WL 416345 (Comp.Gen. Feb. 3, 2009). In *e-Management,* GAO did not bar the challenge to the solicitation cancellation, even though it found that the task order challenge was barred by the task order protest ban. Although in some factual circumstances the task order protest ban might bar a challenge to the cancellation of a solicitation, *MORI* and *e-Management* suggest that an agency's decision to cancel a solicitation may be a distinct procurement decision that is not always "in connection with" the proposed issuance of a task order.

Finally, the court notes that procurement activities, especially those interrupted by multiple protests, often present complex factual scenarios. Dividing these scenarios, topically or chronologically, into discrete, ripe procurement decisions can be challenging for litigants and this court. It is even more challenging to divide these procurement scenarios into discrete chains of "connected" events. On the one hand, the Federal Circuit has a broad view of the agency actions that are "in connection with" a proposed procurement and are thus subject to protest. *Distributed Solutions, Inc. v. United States,* 539 F.3d 1340, 1346 (Fed.Cir.2008) (describing this court's jurisdiction to include protests of "any stage of the federal contracting acquisition process"). On the other hand, § 4106(f) bars, with certain exceptions, protests of agency actions "in connection with" the proposed issuance of a task order. In cases such as the one at bar, the court must draw a line where one "in connection with" series of actions ends, and another "in connection with" series of actions begins. In the court's view, in this case that line falls squarely at the cancellation of the Solicitation.

The court concludes that jurisdiction lies for plaintiff's claim that the State Department's cancellation of the Solicitation was improper.[11]

## VII. The Agency's Cancellation of the Solicitation Survives Review

■■■ BayFirst alleges that the Agency violated 48 C.F.R. § 1.602–2(b) and 48 C.F.R. § 3.101–1 when it canceled the Solicitation. Pl.'s Mot. at 15–20; Pl.'s Reply at 22–25; Tr. at 50. As stated earlier in this opinion, the court questions whether these general "fairness" pronouncements in the FAR are appropriate fodder for the 'violation of procurement regulations' prong of this court's bid protest jurisdiction. In this particular instance, BayFirst asks the court to determine whether the discretionary act of cancelling the Solicitation was fair. There is some support for plaintiff's fairness test for solicitation cancellations, in precedent not binding on this court. *See FFTF Restoration Co., LLC v. United States,* 86 Fed.Cl. 226, 240 (2009) (stating that "where, as here, the plaintiff claims that an agency, in deciding to cancel a negotiated procurement, has failed to act with integrity, fairness, and openness or to treat bidders fairly under FAR 1.102(b)(3) and 1.102–2(c), this court has jurisdiction over the claim as an actionable 'alleged violation of statute or regulation in connection with a procurement' pursuant to 28 U.S.C. § 1491(b)(1)"). To the extent that the court could or should apply these fairness regulations to the Agency's cancellation decision, the court finds no evidence in the record of disparate treatment, unfairness or inequitable treatment.

Plaintiff's unfairness allegations primarily focus on the Agency's decision to cancel the Solicitation rather than to re-evaluate the proposals, including BayFirst's proposal, that were submitted in response to the Solicitation.[12] As a secondary matter, BayFirst

---

**11.** The court notes that the cancellation decision is distinct from the Agency's decision to issue a task order to Alutiiq. Thus, plaintiff cannot found its challenge to the cancellation of the Solicitation on the allegedly improper removal of contract requirements from the 8(a) program or any alleged violation of 13 C.F.R. § 124.506. *Cf.* Tr. at 50–51 (Mr. Block) (noting that one of plaintiff's challenges to the cancellation of the Solicitation asserts that "combining the cancella-

tion with the issuance of a task order violates [13 C.F.R. § 124.506]"). The cancellation, as a discrete act, removed nothing from the 8(a) program and does not, in any way, implicate 13 C.F.R. § 124.506.

**12.** Plaintiff includes the terms "arbitrary, capricious, an abuse of discretion" in one heading of its reply brief, and includes the terms "arbitrary and capricious" in one sentence of a section of

casts aspersions on the Agency's stated justifications for its cancellation decision, as well as on the timing of the cancellation. The court has considered the record evidence and disagrees with plaintiff's reading of the facts cited to support its unfairness allegations.

First, and foremost, in *BayFirst I* the court neither directed the Agency to reevaluate the proposals submitted in response to the Solicitation nor refrained from criticizing the Solicitation. The Agency's decision to cancel the Solicitation does not offend the court's injunction or disregard the court's legal conclusions. Second, although the contracting officer's declaration neglects to fully illuminate every aspect of the chronology of events leading up to and continuing after the cancellation of the Solicitation, the court finds no misdirection or falsehoods in that document.[13] Third, the chronology of events presented in the record does not show undue delay that was unfair to BayFirst. For all of these reasons, even if the court believed that the regulations cited by plaintiff provide the proper legal framework for plaintiff's challenge to the propriety of the cancellation of the Solicitation, the court does not find that either § 1.602–2(b) or § 3.101–1 was violated when the Agency cancelled the Solicitation. The State Department made a prudent, reasoned and fair decision justified by the circumstances.

▮ The court notes that there is another decision of this court which applied the arbitrary and capricious standard in a bid protest challenging the cancellation of a solicitation. *See Def. Tech., Inc. v. United States,* 99 Fed.Cl. 103, 120 (2011) (denying a protest where the government "did not act arbitrarily or capriciously when it canceled the solicitation"). The court believes that the arbitrary and capricious standard is the appropriate standard here, and finds that the Agency's cancellation decision was neither arbitrary nor capricious. The Solicitation contained flaws which might again have led to a flawed evaluation of proposals, and amendment of a flawed Solicitation was not necessarily more efficient than the issuance of a new, updated solicitation. If plaintiff intended to challenge the reasonableness of the Agency's cancellation decision, *see supra* note 12, the court rejects that challenge because the cancellation decision was reasonable under the circumstances.

▮ Finally, the court notes that plaintiff has intimated, but not alleged, that the cancellation of the Solicitation was infected by the Agency's bad faith. *See* Pl.'s Reply at 23 (asserting that the Agency engaged in "gamesmanship"); *id.* at 24 (characterizing the Agency's actions as similar to "deliberate delay"); Tr. at 6 ("[BayFirst] believe[s] that ... the State Department [has] come up with a pretextual way to prevent the BayFirst team from receiving an award in this case...."). As stated earlier in this opinion, the court cannot allow plaintiff to allege bad faith, albeit informally, without holding plaintiff to the evidentiary standard required to prove bad faith on the part of the government. *Cf. Galen,* 369 F.3d at 1330 (holding that evidence of a specific intent to injure the plaintiff is typically required to show bad faith on the part of the government). Here, the court sees no evidence of pretext, bad faith, a specific intent to injure BayFirst, or even a specific intent to injure the BayFirst team (BayFirst and Harding) in the record of the State Department's decision to cancel the Solicitation.[14]

that brief devoted to the discussion of an alleged violation of 13 C.F.R. § 124.506(b). Pl.'s Reply at·17, 20; *see also* Compl. at 7 (mentioning the terms "arbitrary and capricious" in its request for declaratory relief). The court does not infer from these passing references that plaintiff has made a coherent argument that the Agency's cancellation decision was arbitrary and capricious. Even if such an argument had been presented to the court, the court finds, as discussed *infra,* that the Agency's cancellation decision was neither arbitrary nor capricious.

13. The court disagrees with plaintiff's assertion that paragraph thirteen of that document is untrue. Tr. at 15–16.

14. When GAO considers an allegation that the cancellation of a solicitation was pretextual, GAO applies "closer scrutiny" but will uphold the cancellation as long as the decision to cancel the solicitation was reasonable. *e-Management,* 2009 WL 416345, at *3. Under that standard, as well, the court finds that the State Department's decision to cancel the Solicitation was reasonable and proper.

For all of these reasons, plaintiff's challenge to the cancellation of the Solicitation must be rejected by this court.

## CONCLUSION

Because plaintiff has not succeeded on the merits of either of its claims within this court's jurisdiction, the court need not consider the other factors that would or would not support BayFirst's requests for injunctive relief. Plaintiff's motion for judgment on the administrative record is denied. Defendant's motion to dismiss is granted, on jurisdictional grounds, for all of plaintiff's claims other than BayFirst's scope challenge to the Agency's proposed issuance of a task order to Alutiiq and BayFirst's claim that the cancellation of the Solicitation was improper. Defendant's motion for judgment on the administrative record is granted as to the task order scope claim and the improper cancellation claim.

Accordingly, it is hereby **ORDERED** that

(1) Plaintiff's Motion to Supplement Administrative Record, filed March 28, 2012, is **GRANTED;**

(2) Plaintiff's Motion for Judgment Pursuant to Rule 52.1, filed March 15, 2012, is **DENIED;**

(3) Plaintiff's Motion for Permanent Injunction and Declaratory Relief, filed February 27, 2012, is **DENIED;**

(4) Defendant's Motion to Dismiss, and, in the Alternative, Cross–Motion for Judgment upon the Administrative Record, filed March 21, 2012, is **GRANTED;**

(5) The Clerk's Office is directed to **ENTER** final judgment in favor of defendant, dismissing the complaint **with prejudice,** as to plaintiff's scope challenge to the proposed issuance of a task order to Alutiiq and as to the alleged impropriety of the cancellation of the Solicitation, and **without prejudice,** as to all of plaintiff's other claims because they are beyond this court's jurisdiction;

(6) On or before **April 25, 2012,** counsel for the parties shall **CONFER** and **FILE**

with the Clerk's Office a **redacted copy** of this opinion, with any material deemed proprietary marked out and enclosed in brackets, so that a copy of the opinion can then be prepared and made available in the public record of this matter; and

(7) Each party shall bear its own costs.

